UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED ALUMINUM CORPORATION, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 08-cv-977 (JCH) |
| | : | |
| THE BOC GROUP, INC. N/K/A LINDE, INC. | : | AUGUST 20, 2009 |
| Defendant. | : | |

**RULING RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 52)
AND DEFENDANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE
(DOC. NO. 70)**

**I.     INTRODUCTION**

Plaintiff United Aluminum Corporation ("UAC") brings this action against

defendant The BOC Group, Inc., now known as Linde, Inc. ("Linde").  UAC is a

Connecticut corporation which produces aluminum coil.  Linde, a Delaware corporation

with its principal place of business in Murray Hill, New Jersey, has been UAC's sole

supplier of nitrogen since the 1980s.  This suit arises from a dispute between UAC and

Linde over an extension provision in a 1997 nitrogen-supply contract.  UAC seeks a

declaratory judgment that the provision in question entitles it to extend the 1997

contract and, inter alia, to continue purchasing nitrogen from Linde at the prices set

forth in that agreement.  Linde asserts that, while the extension provision entitles UAC

to extend the contract, it does not entitle UAC to continue purchasing nitrogen at the

1997 contract prices.  Accordingly, Linde brings counterclaims against UAC for

declaratory judgment, anticipatory breach, and contract reformation.

On April 16, 2009, UAC moved for summary judgment on its Complaint and on

Linde's Counterclaims.  For the reasons herein, UAC's Motion is granted.

-1-

## II.     STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.     BACKGROUND

### A.  UAC and Linde

UAC is a Connecticut corporation with its principal place of business in North Haven, Connecticut.  See Complaint, Exh. A to Notice of Removal (Doc. No. 1) at 1.

UAC has been in the business of producing aluminum coil since 1915 and is the second oldest aluminum rolling mill in the United States.  See Declaration of John Lapides ("Lapides Decl.") (Doc. No. 52-3) at ¶ 3.  UAC's production method requires the heat treatment of aluminum, a process known as annealing.  See id. at ¶ 4.  Annealing requires temperatures of up to 740 degrees Fahrenheit and a nitrogen inert atmosphere to prevent oxidation and oil staining on the surface of the aluminum coil.  See id.

Linde has been UAC's sole supplier of nitrogen since at least 1987.[1]  See id. at ¶ 5.  The most recent nitrogen supply agreement between UAC and Linde, and the agreement at issue in this suit, took effect on October 1, 1997.  See id. at ¶ 6.  Prior to the October 1, 1997 agreement (the "Supply Agreement"), Linde supplied UAC's nitrogen needs by means of regular shipments of liquid nitrogen.  See id. at ¶ 7.  Linde provided UAC with equipment to vaporize the liquid nitrogen for use in the aluminum production process.  See id.

Negotiations for the Supply Agreement started in or about January 1995, when Linde proposed the installation of a nitrogen generator system at UAC's plant.  See id. at 8.  The generator, which produces gaseous nitrogen at a rate of 32,000 standard cubic feet per hour ("scfh"), was to be a long-term solution for UAC's nitrogen needs at a significant savings over the liquid nitrogen shipments upon which UAC had relied in the past.  See id. at ¶ 9; see also L.R. 56(a)(1) Stmt. at ¶ 8.  In addition to the generator, Linde's proposal included providing UAC with a supplemental supply of liquid

---

[1] Linde was formerly known as The BOC Group, Inc d/b/a/ BOC Gases.  See Plaintiff's Local Rule 56(a)(1) Statement ("L.R. 56(a)(1) Stmt.") at ¶ 2.  For the sake of clarity, the court refers to the defendant by its current name, Linde, throughout this Ruling.

nitrogen to be used when the generator was down or when UAC's nitrogen requirements exceeded the generator's capacity (the "Supplemental System"). See Lapides Decl. at ¶ 9. Through the generator and the Supplemental System (together the "Supply System"), Linde proposed a 100% uptime guarantee. See id.

B. The Agreement

The Supply Agreement, which became effective on October 1, 1997, contains the following provisions regarding the agreement's term:

1. TERM & TERMINATION

    1.1 Term: The term of this Agreement shall commence upon the date of this Agreement as set forth above (the "Effective Date") and shall expire on August 31, 2008, (the "Term") and continue on a month to month basis thereafter, until terminated by UAC upon a minimum of six (6) months prior written notice at any time after December 1, 2007, 9 years and six months from actual date of signing, or until terminated by [Linde] upon a minimum of fifteen (15) months written notice, with such termination to be effective upon cutover to a new vendor, not to exceed 45 days beyond the end of the notice period (the "Supply Period"). Notwithstanding the foregoing, UAC may request an extension on a month to month basis which request shall not be unreasonably withheld or delayed.

    1.1.1. Notwithstanding the foregoing paragraph, [Linde] agrees that at UAC's sole option, UAC may extend the term hereof upon the terms and conditions of this Agreement for a period a minimum of three (3) years, and a maximum of five (5) years commencing upon August 31, 2008, so long as UAC notifies [Linde] of its intention to exercise its option upon or before August 31, 2007. Upon expiration of the extension of the Term under this option the Agreement shall continue on a month-to-month basis in accordance with 1.1 above.

See Supply Agreement, Appendix 1 to L.R. 56(a)(1) Stmt. (Doc. No. 53-2) at 1.

The Supply Agreement's prices and terms of payment were set forth in Exhibit A to the Supply Agreement. Exhibit A contains seven sections, the most relevant of which for the purposes of this action is section VI, titled "Supply Period Pricing." See Exh. A

to Supply Agreement at 2.  This section contains provisions governing, <u>inter</u> <u>alia</u>,

generator maintenance fees, Supplemental System facility fees, and "Product" fees

(<u>i.e.</u>, the price UAC is to pay Linde for nitrogen) for the term "[c]ommencing on the

System Completion Date[2] and terminating on the last day of the Supply Period."  <u>See</u>

<u>id.</u> at 2-5.

Section VI also contains a provision, titled "Pricing upon Generator Upgrade to

38,000 scfh," which states:

> Upon the written request of UAC, [Linde] shall upgrade the Generator to be capable of producing 38,000 scfh (the "Upgrade").  In such event, [Linde] shall use its reasonable efforts to complete the Upgrade within six months of UAC's written request.  The parties agree to extend the Term hereof to five (5) years from completion date of the Upgrade, if less than five years are remaining in the Term at such time.  During the production outage of the Generator for the Upgrade, UAC agrees to purchase its Requirements at the Liquid Nitrogen price of $0.230 scfh, for a maximum period of two weeks regardless of the length of the outage, and at the end of such two week period, Product pricing of the Product delivered to Point of Delivery shall be [as indicated in Pricing Table 2 of the Supply Agreement].

<u>See</u> <u>id.</u> at 5.  To date, UAC has not requested a generator upgrade.[3]

C.  <u>UAC's Attempt to Extend the Supply Agreement</u>

On April 19, 2007, UAC sent Linde a letter by Federal Express notifying Linde

that, "[i]n accordance with the Agreement between [UAC and Linde] effective October

1, 1997, [UAC] intends to exercise its option to extend the term thereof for an additional

five (5) years from September 1, 2008 to August 31, 2013, upon the terms and

---

[2] The System Completion Date is defined in section 3.4 of the Supply Agreement as September 1, 1998.  <u>See</u> Supply Agreement at 2.

[3] Although both UAC and Linde spend significant time addressing the generator upgrade provision, because it is undisputed that UAC has not, to date, requested an upgrade of the generator, the court need not address the interaction between the generator upgrade provision and the extension option under section 1.1.1.

conditions of the Agreement."  See L.R. 56(a)(1) Stmt. at ¶ 25.  In a letter dated May

18, 2007, Linde replied that it would extend the Supply Agreement if UAC accepted a

proposed amendment enclosed with the letter.  See id. at ¶ 26.  The proposed

amendment included a provision which would delete the pricing section of the Supply

Agreement in its entirety and replace it with a new "Supply Period Pricing" section.  See

Appendix 3 to L.R. 56(a)(1) Stmt. at 2.  The prices set forth in Linde's proposed

amendment represent an increase of approximately 38% over the prices set forth in the

Supply Agreement.  See Appendix 9 to L.R. 56(a)(1) Stmt.

On February 19, 2008, UAC sent Linde a letter requesting Linde's formal

acceptance of UAC's notice of exercise of its option to extend the term of the Supply

Agreement upon the same terms and conditions, including price.  See L.R. 56(a)(1)

Stmt. at ¶ 29.  On February 20, 2008, Linde sent UAC a letter stating that Linde's

position remained unchanged (i.e., that it would not extend the Supply Agreement

without an amendment that would alter the Supply Agreement's pricing schedule).  See

id. at ¶ 30.

D.  Procedural Posture

On June 6, 2008, UAC filed a Complaint against Linde in the Superior Court for

the Judicial District of New Haven.  See Complaint, Exh. A to Notice of Removal (Doc.

No. 1).  UAC's Complaint contained one count, which asserted a cause of action for

anticipatory breach of contract.  See id.  On June 27, 2008, Linde removed the state

action to this court.  See Notice of Removal (Doc. No. 1).  On July 14, 2008, Linde filed

an Answer to UAC's Complaint in which it asserted three counterclaims: declaratory

judgment, anticipatory breach of contract, and contract reformation.  See Answer (Doc.

No. 18).

On April 16, 2009, UAC filed a Motion for Summary Judgment seeking a declaratory judgment that "UAC . . . timely exercised its contractual right to extend the [Supply Agreement] for a period of (5) years, to and including August 31, 2013, under all the terms and conditions (including price) specified in the [Supply Agreement]" and further seeking summary judgment on Linde's Counterclaims.  See Motion for Summary Judgment (Doc. No. 52).  Linde opposes the Motion.  See Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Mem. in Opp.") (Doc. No. 63).

On July 2, 2009, Linde filed a Motion for Leave to File Supplemental Evidence in Support of its Opposition.  See Motion for Leave to File Supplemental Evidence ("Motion for Leave to File") Doc. No. 70.  UAC opposes the Motion.  See Memorandum in Opposition to Motion for Leave to File Supplemental Evidence ("Mem. in Opp. to Motion for Leave to File") (Doc. No. 71).  The court now addresses both pending motions.

## IV.   DISCUSSION

### A.  Linde's Motion for Leave to File Supplemental Evidence

In its Motion for Leave to File Supplemental Evidence, Linde seeks leave to file excerpts of the deposition transcripts of Raymond Carr and Jeffrey Johns to supplement its opposition to UAC's Motion for Summary Judgment.  See Motion for Leave to File (Doc. No. 70) at 2.  In support of its Motion, Linde notes that UAC filed its summary judgment motion on April 16, 2009, well before discovery closed on June 30, 2009.  Thus, Linde responded to UAC's Motion before deposing certain individuals, including Carr and Johns.

UAC opposes Linde's Motion, arguing that: (1) the Carr and Johns deposition transcripts are cumulative of the Declaration of Raymond Carr (Doc. No. 66) and the arguments Linde makes in its Memorandum in Opposition to Summary Judgment; and (2) the Motion is untimely because Linde could have filed it before UAC filed its Reply on June 30, 2009, thereby giving UAC an opportunity to address the Carr and Johns deposition testimony in the Reply. The court disagrees. The Carr and Johns deposition testimony is not entirely cumulative and Linde's Motion, filed eight court days after the depositions of Carr and Johns were taken, was not untimely. As a result, Linde's Motion for Leave to File Supplemental Evidence is granted and the excerpts of the Carr and Johns deposition transcripts are part of the record of this case considered by the court in connection with this Ruling.

   B.  <u>Timing of UAC's Motion for Summary Judgment</u>

As noted above, UAC filed its Motion for Summary Judgment on April 16, 2009, over two months before the close of discovery. In its Memorandum in Opposition to Summary Judgment, Linde argues that summary judgment should be denied because UAC's Motion is premature. <u>See</u> Mem. in Opp. at 6-7. Specifically, Linde asserts that "[a]lthough Fed. R. Civ. P. 56 allows a party to move for Summary Judgment before discovery is complete, the Court should exercise its discretion to deny [UAC's] motion without prejudice" on the grounds that "Linde should be allowed to complete its own discovery and have a full opportunity to submit extrinsic evidence to rebut the extrinsic evidence submitted by UAC." <u>See</u> <u>id.</u> at 7.

UAC contends that, because discovery closed on June 30, 2009, Linde has "had ample opportunity to obtain discovery needed to respond to UAC's Motion for Summary

Judgment," and therefore "there is no reason to delay a decision [on that Motion]."  <u>See</u>
Reply (Doc. No. 69) at 1.  The court agrees.

"Summary judgment may be inappropriate where the party opposing it shows
that he cannot at the time present facts essential to justify his opposition."  <u>Miller v.
Wolpoff & Abramson, L.L.P.</u>, 321 F.3d 292, 304 (2d Cir. 2003) (internal quotations and
citation omitted).  In other words, "[t]he nonmoving party must have had the opportunity
to discover information that is essential to his opposition to the motion for summary
judgment."  <u>Id.</u>  In this case, Linde's argument that UAC's Motion is premature is based
on the fact that, at the time Linde filed its opposition on June 3, 2009, there were
several depositions that had been noticed but not yet taken.  <u>See</u> Mem. in Opp. at 6.
All discovery was completed by June 30, 2009, however, and, as discussed above, the
court grants Linde leave to file transcripts of depositions taken after it filed its opposition
to summary judgment.  <u>See</u> <u>supra</u> at 7-8.  Consequently, Linde has not demonstrated
that it did not have "the opportunity to discover information that is essential to [its]
opposition to the motion for summary judgment," and thus the court knows of no reason
not to address the merits of UAC's Motion.  <u>Miller</u>, 321 F.3d at 304.

    C.  <u>The Term and Extension of the Supply Agreement</u>

The crux of this contract dispute is the interpretation of section 1.1.1 of the
Supply Agreement and the implications of that interpretation on section 1.1 and Exhibit
A, section VI.  In Connecticut, "[a]lthough ordinarily the question of contract
interpretation, being a question of the parties' intent, is a question of fact . . . where
there is definitive contract language, the determination of what the parties intended by

their contractual commitments is a question of law."[4]  Conn. Light & Power Co. v. Lighthouse Landings, Inc., 279 Conn. 90, 109 (Conn. 2006).  Because there is definitive contract language in this case, the question of what UAC and Linde intended in section 1.1.1 of the Supply Agreement must be resolved by the court.

Under Connecticut law, a contract must be construed "to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Goldberg v. Hartford Fire Ins. Co., 269 Conn. 550, 559 (Conn. 2004) (internal quotation and citation omitted).  "The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Id. (internal quotation and citation omitted).  Further, if the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. See id. at 30.  If, however, the language has "a definite and precise meaning concerning which there is no reasonable basis for a difference of opinion," the contract is unambiguous. See id.

In this case, UAC argues that the plain language of section 1.1.1 evidences the parties' intention to allow UAC to extend the Supply Agreement for five years under all the terms and conditions, including price, of that Agreement.  Linde, on the other hand, contends that the parties did not intend to give UAC the option to unilaterally extend the Supply Agreement for five years at 1997 prices, but rather "intended to agree on the

_____

[4] The Supply Agreement states that it "shall be interpreted in accordance with the laws of the State of Connecticut without application of conflict of law or choice of law." See Supply Agreement at 7.

fees, prices, and terms of payment for the extension period if and when the extension

period was exercised."  Defendant's Counterclaims (Doc. No. 18) at ¶ 23.

The arguments Linde asserts to support its position fall into two categories: (1)

section 1.1.1 was not intended to extend the "Term" of the Supply Agreement as

defined in the contract; and (2) even if section 1.1.1 can be read to extend the "Term" of

the Supply Agreement, the prices set forth in Exhibit A, section VI do not apply to the

extension period.  The court addresses the arguments separately.

1.   Extension of the Supply Agreement's "Term" under Section 1.1.1

Section 1.1 of the Supply Agreement states: "The term of this Agreement shall

commence upon the date of this Agreement as set forth above (the "Effective Date")

and shall expire on August 31, 2008, (the "Term") . . . ."  Supply Agreement at 1.  In

section 1.1.1, however, the Supply Agreement states:

> 1.1.1.   Notwithstanding the foregoing paragraph, [Linde] agrees that at
> UAC's sole option, UAC may extend the term hereof upon the terms and
> conditions of this Agreement for a period a minimum of three (3) years, and
> a maximum of five (5) years commencing upon August 31, 2008, so long as
> UAC notifies [Linde] of its intention to exercise its option upon or before
> August 31, 2007.  Upon expiration of the extension of the Term under this
> option the Agreement shall continue on a month-to-month basis in
> accordance with 1.1 above.

Id.  In its Memorandum in Opposition, Linde argues that the five-year extension allowed

by section 1.1.1 does not extend the "Term" of the Supply Agreement as defined in

section 1.1.  See Mem. in Opp. at 10.  Rather, Linde explains, the fact that the first

sentence of section 1.1.1 contains the generic "term" rather than the previously defined

"Term" evinces the parties' intent to "create a new extension period to the Agreement

and not to extend the 'Term.'"  Id.  UAC, on the other hand, contends that the only

reasonable interpretation of this clause is that the words "term" and "Term" in section 1.1.1 are referring to the same period, i.e., the "Term" of the contract as defined in section 1.1.  See Reply at 7.  The court agrees.

Section 1.1.1's use of the minuscule "term" in the first sentence and the majuscule "Term" in the second sentence is problematic.  On the one hand, if, as Linde suggests, the distinction is a manifestation of the parties' intent to create a new time period altogether rather than to extend the original term of the Agreement, such explanation renders other language in section 1.1.1 inexplicable.  For example, if the parties did not intend section 1.1.1 to extend the "Term" of the Supply Agreement, what is the meaning of the phrase "UAC may extend the term hereof" in the first sentence of that section?  Moreover, if the parties did not intend section 1.1.1 to extend the "Term" of the Supply Agreement, why does the second sentence of section 1.1.1 state: "Upon expiration of the extension of the Term under this option the Agreement shall continue on a month-to-month basis in accordance with 1.1 above"?  Supply Agreement at 1 (emphasis added).

On the other hand, if, as UAC suggests, the words "term" and "Term" refer to the same period (i.e., the "Term" of the Supply Agreement as defined in section 1.1), the inconsistent spelling can only be explained as typographical error or inattentive drafting. Given the choice between the parties' explanations, the court finds UAC's persuasive.[5]

---

[5] Whether typographical error or inattentive drafting, section 1.1.1 is not the only time the drafters used the minuscule "term" when referring to the majuscule "Term" of the agreement: Section 3.9 states, "[Linde] shall, at its sole expense, remove the Supply System installed within ninety (90) days after the termination of this Agreement for any reason, including the expiration of the term of this Agreement . . . ." See Supply Agreement at 3 (emphasis added).  The interpretation of section 1.1.1 Linde advances would render this section inexplicable as well.

The interpretation that "term" and "Term" as used in section 1.1.1 both refer to the "Term" of the Supply Agreement leads to a clear and unambiguous contract: If UAC exercises its option under section 1.1.1 in a timely manner, the "Term" of the Supply Agreement is extended for a minimum of three years and a maximum of five years, commencing on August 31, 2008.  Thus, it is the conclusion of the court that it was the parties' intent that UAC's timely exercise of its option under section 1.1.1 would extend the original term of the Supply Agreement.  See Transatlantic Lines LLC v. United States, 2007 U.S. Dist. LEXIS 15590, *6 (D. Conn. Mar. 5, 2007) ("An interpretation which gives a reasonable meaning to all of [a contract's] parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result") (internal quotation omitted).

> 2.  Pricing During the Five-Year Extension

Notwithstanding the foregoing conclusion, the court must address Linde's assertion that, even if section 1.1.1 extends the "Term" of the Supply Agreement, the prices set forth in Exhibit A, section VI of the Agreement do not apply to the extension period. In support of this assertion, Linde argues, inter alia, that the phrase "terms and conditions" in section 1.1.1 excludes the pricing schedule set forth in Exhibit A, section VI.  See Supply Agreement at 1 ("UAC may extend the term hereof upon the terms and conditions of this Agreement . . .").  Specifically, Linde argues that the plain language of the Supply Agreement itself recognizes the distinction between "terms and conditions"

and "prices;"[6] cites the Affidavit of its employee Raymond Carr for the proposition that, "[i]n the commercial gas industry, price is generally distinct from terms and conditions," see Affidavit of Raymond Carr ("Carr Affidavit") (Doc. No. 66) at ¶ 7; and avers that UAC president John Lapides distinguished between "price" and "terms and conditions" during his deposition.[7]   Finally, Linde asserts that, in the event the court finds that the Supply Agreement does not clearly convey the parties' intent to exclude price from the "terms and conditions" of the Agreement, the court should conclude that the Supply Agreement is ambiguous as to whether the prices set forth in Exhibit A, section VI apply to the extended term and therefore should find that the parties' intent in including section 1.1.1 is a question of fact which must be left to the jury.   The court disagrees.

"A contract is interpreted by the intent of the parties expressed in the language of the agreement," Topf v. Warnaco, Inc., 942 F. Supp. 762, 767 (D. Conn. 1996), and "[t]he language [of the contract] must be given its ordinary meaning unless a technical or special meaning is clearly intended."   Ingalls v. Roger Smith Hotels Corp., 143 Conn. 1, 6 (Conn. 1955).   Further, the circumstances surrounding the making of the contract, the purposes the parties sought to accomplish, and their motives in making the contract cannot establish an intent contrary to the plain meaning of the language in the contract.

---

[6] In support of this argument, Linde cites section 5 of the Supply Agreement, which notes that, "prices and terms of payment for the Supply System" are located in Exhibit A, as well as section 3.9, which states, "[Linde] shall, at its sole expense, remove the Supply System installed within ninety (90) days after the termination of this Agreement for any reason . . . subject to the terms of this Agreement."   See Supply Agreement at 3, 4.

[7] At an April 27, 2009 deposition, when asked to compare nitrogen prices in two exhibits not identified in the transcript excerpts provided to the court, Lapides stated that, "[t]he terms and conditions under which the pricing applies are very different."   See April 27, 2009 Deposition Testimony of John Lapides ("4/27/2009 Lapides Depo."), Appendix 2 to Defendant's Local Rule 56(a)(2) Statement ("L.R. 56(a)(2) Stmt.") (Doc. No. 64) at 57:5-6.

See DeCarlo & Doll, Inc. v. Dilozir, 45 Conn. App. 633, 639 (Conn. App. Ct. 1997).  In other words, when only one interpretation of the plain language of the contract is possible, "the Court need not look outside the four corners" of the document itself.  Id. Moreover, the court will not "torture words to import ambiguity where the ordinary meaning [of the contract language] leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings." Exec. Airlines v. Elec. Boat Corp., 271 F. Supp. 2d 392, 395 (D. Conn. 2003).

The question before the court is whether the parties intended the pricing schedule set forth in Exhibit A, section VI to be a "term or condition" of the Agreement that could be extended, at UAC's sole option, pursuant to section 1.1.1.  The Supply Agreement does not explicitly answer this question; it neither defines the phrase "terms and conditions," nor states whether the "terms and conditions" of the Agreement include the prices set forth in Exhibit A, section VI.  What is more, Linde's argument that the Agreement clearly evinces the parties' intent to exclude price from the Agreement's "terms and conditions" is unpersuasive.  Contrary to Linde's assertion, the fact that section 5 refers to "prices" and "terms of payment" separately is not conclusive of the question before the court.  "Terms of payment" are not the same as "terms and conditions."[8]

Despite the Supply Agreement's lack of an explicit definition of the phrase "terms

_____

[8] Linde also asserts that section 3.9 of the Supply Agreement manifests the parties' intent to distinguish between "price" and "terms and conditions."  Section 3.9 states, in relevant part, "[Linde] shall, at its sole expense, remove the Supply System installed within ninety (90) days after the termination of this Agreement for any reason . . . subject to the terms of this Agreement."  See Supply Agreement at 3.  The court cannot conclude that section 3.9 reveals any intent on the part of Linde or UAC to exclude price from the Agreement's "terms and conditions."

and conditions" as used in section 1.1.1, the language of that clause is straightforward: "[Linde] agrees that at UAC's sole option, UAC may extend the term [of the Supply Agreement] upon the terms and conditions of this Agreement for a period a minimum of three (3) years, and a maximum of five (5) years . . . ."  <u>See</u> Supply Agreement at 1. The language contains no clear intent of any special or technical meaning of the words, and so the court gives them their ordinary meaning.  <u>See</u> <u>Ingalls v. Roger Smith Hotels Corp.</u>, 143 Conn. 1, 6 (Conn. 1955).  Thus, the question the court must resolve is whether Exhibit A, section VI, which sets forth the pricing schedule, is a "term" or "condition" of the Supply Agreement within the ordinary meaning of those words.

Merriam-Webster's Online Dictionary defines "terms" as "provisions that determine the nature and scope of an agreement."  http://www.merriam-webster.com/ dictionary/term (last visited Aug. 6, 2009); <u>see</u> <u>United States v. Elfgeeh</u>, 515 F.3d 100, 142 n.2 (2d Cir. 2008) (quoting Merriam-Webster's Online Dictionary).  Consequently, under the plain language of the Supply Agreement, Exhibit A, section VI is a "term" of the Supply Agreement if it is a provision that determines the "nature and scope" of the Agreement.  Because price is clearly part of the nature and scope of the Supply Agreement, the court concludes that Exhibit A, section VI – which determines prices under the Agreement – is a "term" of the Agreement and is applicable to any extension of the Agreement's "Term" under section 1.1.1.

This conclusion is consistent with the holdings of courts that have addressed questions similar to those presented in this case.  As UAC noted in its Memorandum in Support of Summary Judgment, in <u>Southern New England Tel. Co. v. Public Utilities Com.</u>, 144 Conn. 516 (Conn. 1957), the Connecticut Supreme Court held, in the

context of a statutory interpretation, that "according to the commonly approved usage of the language," the word "terms" in the phrase "terms or conditions" includes price.  See Southern New England Tel. Co. v. Public Utilities Com., 144 Conn. 516 (Conn. 1957) ("'Terms' means 'conditions; as, the terms of a sale; hence, specif.: stipulations regarding payment, price or wages'") (quoting Webster's New International Dictionary (2d Ed)).  Other courts have noted that parties may restrict the phrase "terms and conditions" if they wish it to limit its meaning, e.g., to all terms and conditions except price.  See, e.g., Gatt Trading, Inc. v. Sears, Roebuck, & Co., 2004 U.S. Dist. LEXIS 22550 (N.D. Tex. 2004).  In this case, the parties did not so restrict the phrase.

It also bears noting that this interpretation of the Supply Agreement is the only one which does not render the extension option in section 1.1.1 useless.  If the court were to conclude, as Linde urges, that the plain language of the contract demonstrates the parties' intent "to agree on the fees, prices, and terms of payment for the extension period at the time the extension option was exercised," the value of UAC's ability to extend the Supply Agreement at its "sole option" as set forth in section 1.1.1 would be entirely dependent on Linde's subsequent willingness to agree to new fees, prices, and terms of payment.  Defendant's Counterclaims (Doc. No. 18) at ¶ 23.  In other words, under Linde's interpretation, UAC's "sole option" to extend the Supply Agreement under section 1.1.1 is both useless (i.e., it is an option to extend all the terms and conditions of the Agreement except price, without which there is no Agreement) and not UAC's "sole option" at all (i.e., Linde must still agree on the fees, prices, and terms of payment in order for the Agreement to actually be extended).  The conclusion that the parties intended to include price in the phrase "terms and conditions" as used in section 1.1.1

-17-

avoids rendering section 1.1.1 useless.  See Transatlantic Lines LLC v. United States, 2007 U.S. Dist. LEXIS 15590, *6 (D. Conn. Mar. 5, 2007) ("An interpretation which gives a reasonable meaning to all of [a contract's] parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result") (internal quotation omitted). Such conclusion also avoids the court adding to section 1.1.1 a provision conditioning UAC's extension option on the parties' later agreement on prices for the extension period, which provision is absent from the Supply Agreement.  See Slifkin v. Condec Corp., 13 Conn. App. 538, 545 (Conn. App. Ct. 1988) ("The court cannot add to a contract a new term not previously considered by the parties, even though on later review of the contract by one of them it appears desirable to do so, and in all probability it could have been originally inserted") (citing Collins v. Sears, Roebuck & Co., 164 Conn. 369, 374-75 (Conn. 1973)).

Because the court has concluded that there is only one possible interpretation of the plain language of the Supply Agreement, the court need not address Linde's argument that the Supply Agreement is ambiguous.  See Levine v. Massey, 232 Conn. 272, 278 (Conn. 1995) ("When the intention conveyed by the terms of an agreement is clear and unambiguous, there is no room for construction," and "[t]he court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity") (internal quotations omitted).  Likewise, the court need not address the extrinsic evidence Linde cites in support of its interpretation.  See DeCarlo & Doll, Inc. v. Dilozir, 45 Conn. App. 633, 639 (Conn. App. Ct. 1997) ("When only one interpretation of a contract is possible, the court need not look outside the four corners of the

contract").

UAC is entitled to summary judgment on Count One of its Complaint and

judgment will enter declaring that UAC timely exercised its contractual right to extend

the Supply Agreement for a period of five years, to and including August 31, 2013,

under all the terms and conditions (including price) specified in the Agreement.

    D.  <u>Linde's Counterclaims</u>

Linde brings three Counterclaims against UAC: (1) declaratory judgment; (2)

anticipatory breach of contract; and (3) contract reformation.  <u>See</u> Defendant's

Counterclaims (Doc. No. 18) at ¶¶ 8-41.

In its first Counterclaim, Linde seeks a declaration that:

> (1) Neither section 1.1.1 of the Agreement, nor any other provision of the
> Agreement, authorizes UAC to extend the Agreement under the fees, prices,
> and terms of payment set forth in Exhibit A; [and] (2) since the parties
> intended to agree on the fees, prices, and terms of payment for the
> extension period at the time the extension option was exercised and cannot
> now agree on those terms, there is no extension period to the contract and
> the Agreement will expire on August 31, 2008, or in the alternative, that the
> Agreement is extended and the Court shall fix reasonable fees and prices
> pursuant to Conn. Gen. Stat. § 42a-2-305(1).

Defendant's Counterclaims at ¶ 28.  In its second Counterclaim, Linde asserts a cause

of action for anticipatory breach of contract based on UAC's refusal to provide

assurances that it will accept amended fees, prices, and terms of payment for the five-

year extension period set forth in section 1.1.1.  <u>See</u> <u>id.</u> at ¶¶ 33-34.  For the reasons

set forth above, <u>see</u> <u>supra</u> 8-18, the court has rejected the arguments upon which

Linde's first and second Counterclaims are based, and accordingly, UAC's Motion for

Summary Judgment is granted as to Linde's Counterclaims for declaratory judgment

and anticipatory breach of contract.

Linde's third Counterclaim seeks reformation of the Supply Agreement on the grounds that "the increase in gas prices and operation costs makes it commercially unreasonable for Linde to continue to perform under the fees, prices, and terms of payment referenced in Exhibit A for an extension period of five (5) years." Defendant's Counterclaims at ¶ 40. UAC asserts that it is entitled to judgment on Linde's third Counterclaim because, inter alia, Linde has not come forward with evidence on which a jury could fined the impracticability of the Supply Agreement. The court agrees.

The Connecticut Uniform Commercial Code codifies the common law doctrine of commercial impracticability by excusing a seller from performance made impracticable by the occurrence of a contingency, the non-occurrence of which was a basic assumption on which the contract was made. See Conn. Gen. Stat. § 42a-2-615(a). As the Connecticut Supreme Court has held:

> The impracticability doctrine represents an exception to the accepted maxim of pacta sunt servanda, in recognition of the fact that certain conditions cannot be met because of unforeseen occurrences. A party claiming that a supervening event or contingency prevents, and thus excuses, a promised performance must demonstrate that: (1) the event makes the performance impracticable; (2) the nonoccurrence of the event is a basic assumption on which the contract is made; (3) the impracticability results without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes.

Dills v. Enfield, 210 Conn. 705, 717 (Conn. 1989) (internal quotations and citations omitted). Importantly, "only in the most exceptional circumstances have courts concluded that a duty is discharged because additional financial burdens make performance less practical than initially contemplated." Id.

This case does not present such an exceptional circumstance. Linde seeks to

escape its obligations under the Supply Agreement because "the increase in gas prices and operation costs makes it commercially unreasonable for Linde to continue to perform" those obligations.  Defendant's Counterclaims at ¶ 40.  Linde does not allege that the increase in gas prices and operation costs is due to an unforseen event, the nonoccurrence of which was a basic assumption on which the Supply Agreement was made.  Rather, Linde's request for reformation seems to rest on its argument that allowing UAC to continue purchasing nitrogen at prices agreed to in 1997 is "unreasonable" and "illogical" because to do so would be unprofitable for Linde.  Mem. in Opp. at 13.  However, the fact that the Supply Agreement is now unprofitable to Linde due to an increase in market prices does not excuse it from its obligations under the Supply Agreement.  As the comments to section 2-615 of the Uniform Commercial Code provide:

> Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance.  Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover.

U.C.C. § 2-615, Official Comment 4.  Because Linde has not set forth evidence which would support a finding that the rise in gas prices and operations costs was due to some unforeseen contingency which alters the essential nature of the performance of the Supply Agreement, UAC's Motion for Summary Judgment is granted as to Linde's third Counterclaim.

## V.    CONCLUSION

For the foregoing reasons, plaintiff's Motion for Summary Judgment (Doc. No.

52) is **GRANTED**.  The court **DECLARES** that plaintiff has timely exercised its contractual right to extend the Supply Agreement for a period of five years, to and including August 31, 2013, under all the terms and conditions (including price) specified in the Supply Agreement.  Defendant's Motion for Leave to File Supplemental Evidence (Doc. No. 70) is **GRANTED**.  The Clerk is directed to enter judgment and close this case.

**SO ORDERED**.

     Dated at Bridgeport, Connecticut this 20th day of August, 2009.


        /s/ Janet C. Hall
        Janet C. Hall
        United States District Judge